**No. 22-55560**

**In the United States Court of Appeals
for the Ninth Circuit**

GILBERT SAUCILLO and JAMES R. RUDSELL,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees,*
and
JOHN BURNELL and JACK POLLOCK,
*Plaintiffs,*
v.
SADASHIV MARES,
*Objector-Appellant,*
v.
SWIFT TRANSPORTATION COMPANY OF ARIZONA, LLC, an Arizona Corporation,
*Defendant-Appellee,*
v.
SWIFT TRANSPORTATION COMPANY, ET AL.,
*Defendants.*

On Appeal from the United States District Court,
for the Central District of California
No.: 5:10-CV-00809-VAP-OPx

**PLAINTIFFS-APPELLEES' ANSWERING BRIEF**

JAMES R. HAWKINS
GREGORY MAURO
JAMES HAWKINS APLC
9880 Research Drive, Suite 200
Irvine, CA 92618

STANLEY D. SALTZMAN
MARIN & SALTZMAN, LLP
29800 Agoura Road
Agoura Hills, CA 91301

November 18, 2022

DEEPAK GUPTA
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Table of authorities.................................................................................iii

Introduction.............................................................................................1

Statement of the issues...........................................................................4

Statement of the case.............................................................................5

    I.    Several Swift Transportation drivers seek relief for the
company's violations of California labor laws. ....................................5

        A.    Burnell and Pollock notify the state of Swift's
violations and file suit. ................................................5

        B.    Rudsell notifies the state of similar labor-law violations
and files suit. ..............................................................8

    II.    The parties litigate the drivers' claims for several years.......................9

        A.    Novel questions of federal preemption are repeatedly
raised.........................................................................9

        B.    The parties engage in discovery and class-certification
proceedings. ............................................................11

    III.    After a decade of extensive discovery and protracted
litigation, the parties finally reach a settlement agreement.................12

        A.    The parties agree to settle their claims and consolidate
their cases.................................................................12

        B.    The plaintiffs seek preliminary approval of their
settlement agreement, detailing the roadblocks to
recovery. ..................................................................15

        C.    The district court grants preliminary approval of the
settlement.................................................................21

        D.    The district court grants final approval of the
settlement and rejects a small number of objections. ...............23

i

E.    This Court vacates and remands to the district court, which once again approves the proposed settlement—this time under a heightened fairness standard. ......................28

Summary of argument....................................................................29

Standard of review........................................................................31

Argument.......................................................................................33

I.    The district court applied the correct legal standard on remand. ...............................................................................34

II.    The district court weighed all of the relevant factors, including the risks of further litigation and the substantial relief the settlement guaranteed. ...........................................35

III.    The district court's careful examination of the settlement uncovered no signs of collusion between counsel and no reason to second-guess the settlement...................................38

A.    The parties had engaged in fair, informed, and arm's-length negotiations, with the guidance of a skilled mediator...................................................................38

B.    The settlement amount was sufficiently supported by the record and well within the range of reasonableness. ......................................................42

Conclusion ....................................................................................46

# TABLE OF AUTHORITIES

## Cases

*Allen v. Bedolla,*
787 F.3d 1218 (9th Cir. 2015)......................................................................32

*Campbell v. Facebook,*
951 F.3d 1106 (9th Cir. 2020).............................................................*passim*

*Campbell v. Vitran Express, Inc.,*
582 F. App'x 756 (9th Cir. 2014) ................................................................9

*Churchill Village, L.L.C. v. General Electric,*
361 F.3d 566 (9th Cir. 2004)......................................................................42

*Dilts v. Penske Logistics, LLC,*
769 F.3d 637 (9th Cir. 2014)..................................................................9, 10

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998).............................................................*passim*

*In re Bluetooth Headset Productions Liability Litigation,*
654 F.3d 935 (9th Cir. 2011) ........................................................32, 33, 39

*In re Hyundai & Kia Fuel Economy Litigation,*
926 F.3d 539 (9th Cir. 2019) ........................................................32, 33, 35

*International Brotherhood of Teamsters, Local 2785 v. Federal Motor Carrier Safety Administration,*
986 F.3d 841 (9th Cir. 2021).....................................................................19

*Lane v. Facebook, Inc.,*
696 F.3d 811 (9th Cir. 2012).......................................................32, 33, 43

*Linney v. Cellular Alaska Partnership,*
151 F.3d 1234 (9th Cir. 1998)...................................................................32

*Officers for Justices v. Civil Service Commission of City & County of San Francisco,*
688 F.2d 615 (9th Cir. 1982)...............................................................43, 46

*Rodriguez v. West Publishing Corp.,*
563 F.3d 948 (9th Cir. 2009) ......................................................26, 36, 38

*Roes, 1–2 v. SFBSC Management, LLC,*
  944 F.3d 1035 (9th Cir. 2019)............................................................*passim*

*Saucillo v. Peck,*
  25 F.4th 1118 (9th Cir. 2022) ...............................................................3, 28

## Rules

Federal Rule of Civil Procedure 23(e)(2).....................................................31, 35, 39

## INTRODUCTION

This case has a long history and is back before this Court for a second time. For years, truck drivers employed by Swift Transportation in California were underpaid, denied meal and rest breaks, uncompensated for business expenses, and subjected to a host of other unlawful labor practices. In 2010, one of these drivers, John Burnell, sued Swift under California law, seeking relief on behalf of himself and similarly situated drivers. Other drivers soon followed suit, laying bare the breadth of Swift's violations over time. A decade of zealous litigation followed. Although Swift challenged the drivers' claims at every turn, the drivers pressed ahead and met each of these challenges until the court denied class certification, prompting the drivers to chart a new path forward. In 2019, after engaging in mediation and a year of tireless negotiations, the drivers secured a $7.25 million settlement.

Years of litigation had finally resulted in meaningful relief. The settlement promised each driver compensation in proportion to the number of weeks he or she had worked relative to the total weeks worked by the class. The class also recovered half a million dollars in civil penalties on behalf of the state, of which three-quarters would go to the state and one-quarter to the class. Class counsel estimated that participating class members would receive an average payment of approximately $217, with the largest payment estimated to be nearly $3,500. When the drivers were

notified of the settlement, virtually all of them were satisfied: Of the 19,544 drivers in the class, less than 0.1% opted out or filed objections.

The district court approved the settlement as well, finding it fair, reasonable, and adequate. The court explained that the settlement amount was well within the range of reasonableness, particularly considering the risks the drivers would face if they continued to litigate the case. The court had already denied class certification in this and two similar cases. And, while the case was pending, the trucking industry had persuaded the Federal Motor Carrier Safety Administration to issue a determination that California's meal and rest break laws were preempted, injecting further uncertainty about the viability of the drivers' claims. And this was all on top of the usual costs, risks, and delay associated with taking a case to summary judgment and trial. At each step, the risks were substantial.

Over two rounds of approval, the district court had no difficulty rejecting objections by the same pair of sole objectors, only one of whom now persists in appealing. The court rebuffed Sadashiv Mares's challenge to the parties' estimate of the maximum value of their claims, concluding that the parties had proffered sufficient evidence in support of their estimates and that the overall amount was fair, reasonable, and adequate. And although the court found the substance of the settlement fair, reasonable, and adequate, it criticized the parties' proposed attorneys' fee award not once, but twice, and ultimately trimmed the final award.

2

In a previous appeal, this Court credited none of the objectors' complaints about the settlement. Instead, the panel remanded solely because the district court had failed to "cite or otherwise acknowledge our longstanding precedent requiring a heightened fairness inquiry prior to class certification." *Saucillo v. Peck*, 25 F.4th 1118, 1131 (9th Cir. 2022) (quoting *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019)). The panel recognized that "the district might decide to once again approve the settlement pursuant to the correct legal standard." *Id.* at 1133.

That is just what happened. On remand, the district court conducted a diligent and heightened review. After requesting further briefing from the parties in light of this Court's opinion, the court found—based on the rigorous, heightened review appropriate in the absence of a certified class—that the settlement was a product of arm's-length, serious, informed, and non-collusive negotiations between experienced and knowledgeable counsel, and that it is fair, adequate, and reasonable. The district court's thorough and meticulous review of all settlement terms is perhaps most clearly evidenced by its reduction of attorney's fees by 8.33%.

Despite all this, the objectors persist, complaining that the settlement amount should have been higher. But they ignore the reality that a settlement is a compromise between the parties. A compromise, by definition, falls somewhere between no recovery and full recovery. An objector can always protest any settlement by asserting that the claims should have been valued more highly or that they should

have been discounted less based on the risks of the litigation. When it comes to assessing the amount of a settlement, however, Rule 23 demands neither perfection nor clairvoyance. Instead, it tasks the district court with ensuring that the settlement was not the product of collusion between counsel and resulted in an agreement that was fair, reasonable, and adequate. The district court properly discharged that obligation here. This Court should therefore affirm the district court's final approval of the settlement.

## STATEMENT OF THE ISSUES

After nearly a decade of discovery, denial of class certification, claims of preemption, appeals, stays, mediation, negotiations, and a remand for application of heightened review, did the district court reasonably exercise its discretion in approving the class settlement as fair, reasonable, and adequate, given the risks of further litigation and the relief the settlement guaranteed?

## STATEMENT OF THE CASE

**I.** **Several Swift Transportation drivers seek relief for the company's violations of California labor laws.**

**A.** **Burnell and Pollock notify the state of Swift's violations and file suit.**

Swift Transportation is one of the largest trucking companies in the United States.[1] Dkt. 70-1 at 9. The company employed roughly 19,000 drivers at the time this litigation began. Dkt. 226-1 at 2. One of those drivers, John Burnell, worked for Swift from January 2008 to February 2009, transporting goods to locations in and out of California. *Id.*

In September 2009, Burnell sent a letter to the California Labor & Workforce Development Agency (LWDA) detailing the manifold ways in which Swift had violated California labor laws. Dkt. 226-1; *see also* Dkt. 202-1 at 2. Burnell explained that Swift had agreed to mileage-based pay—that is, a specific sum tied to the number of miles he drove at the company's direction—but that Swift had "invariabl[y] paid" him and his fellow drivers less than what it had promised. Dkt. 226-1 at 2. Swift further curtailed its drivers' earnings by depositing their wages into payroll accounts that the drivers could not access without paying fees. *Id.* This was not all: The company also required the drivers to work off the clock without

---

[1] The defendants in this case are Swift Transportation Co., Inc. and Swift Transportation Co. of Arizona, LLC, collectively referred to as "Swift" or "the defendant" in this brief. Dkt. 236 at 1.

compensation, failed to keep legally required records pertaining to the number of hours worked and miles driven, did not provide meal and rest periods, and did not provide its drivers with accurate wage statements. *Id.* at 2-3. Burnell's letter spelled out these problems in detail and listed the Labor Code provisions that he alleged Swift was violating—sections 200, 201, 202, 203, 204, 210, 212, 213, 225.5, 226, 226.7, 510, 512, and 2802. *Id.* at 2. His letter served as notice to the agency under PAGA. *Id.*

The following month, the LWDA informed Burnell that it did not intend to investigate the claims alleged in the letter. ER431-32; Dkt. 202-1 at 8. Consequently, in March 2010, Burnell filed a class action in state court on behalf of himself and similarly situated Swift employees in California on the basis of the claims outlined in his letter to the LWDA. ER412-32. Burnell alleged that Swift drivers were not fully paid for time spent driving miles in excess of the estimated mileage for which they were paid, performing inspections, fueling vehicles, waiting for assignments from dispatch, and hooking and unhooking empty trailers. ER422-24. Burnell also alleged that Swift had failed to provide required meal and rest periods, furnish accurate wage statements, used unlawful payment instruments, provide earned wages at separation, and that Swift had engaged in unfair competition practices. ER424-29. The complaint also alleged that the drivers were not provided reimbursement for necessary expenditures incurred in the course of their duties, including expenses associated with "mileage, sales material, cell phone charges, and the like." ER416.

Burnell sought both statutory damages and civil penalties under PAGA for these violations. ER429-31. Swift removed the case to federal court. ER390-409.

Burnell was not the only driver impacted by Swift's policies and practices. Not long after Burnell filed his complaint, another Swift driver named Jack Pollock sought relief from Swift's labor-law violations as well. Dkt. 202-1 at 2. In an October 2010 letter to the LWDA, Pollock, who had worked for the company from July 2008 to June 2010, again explained how the company failed to fully compensate its drivers for miles driven and time spent on work activities. *Id.* at 8. The letter detailed how Swift failed to pay its drivers for meal and rest periods, failed to timely provide drivers with wages owed when their employment ended, and failed to fully indemnify its drivers for necessary business expenses incurred in the course of their duties. *Id.* at 9-16. Pollock retained the same counsel as Burnell, and like Burnell, enumerated each of the Labor Code provisions that Swift had violated—sections 201, 202, 203, 204, 212, 223, 226, 226.7, 512, 1194, 1197, 1197.1, 1198, and 2802. Pollock's letter "serve[d] as an update to [the] original correspondence" from Burnell. *Id.* at 8.

Shortly thereafter, Burnell filed an amended complaint adding Pollock as a named plaintiff. Dkt. 19-2; Dkt. 20. Between January 2011 and August 2012, the case was stayed pending a ruling from the California Supreme Court on meal- and rest-period requirements. Dkt. 34; 46.

**B.    Rudsell notifies the state of similar labor-law violations and files suit.**

Meanwhile, in January 2012, another Swift driver, James Rudsell, filed a class action in state court concerning Swift's ongoing violations of California labor laws. Dkt. 1 at 40-60; *see also* Dkt. 202-1 at 2; Dkt. 202-1 at 4. Rudsell, who had been employed by Swift since June 2011, filed the action on behalf of himself and all non-exempt Swift drivers employed in California, bringing claims that resembled those of the other California drivers who had sued Swift. Dkt. 1 at 43, 46. Rudsell alleged that the mileage-based pay that drivers were promised "did not always equate to minimum wage for all hours worked," that drivers were "required to attend three days of orientation all without payment of minimum wages," that drivers were "regularly required to work without being [paid] minimum wage waiting for loads and unloads," and that drivers were "systematically denied meal periods and rest breaks due to the demands of Defendants and Defendant's clients." *Id.* at 46-47. Rudsell also wrote to the LWDA and Swift to notify them that he sought to bring claims under PAGA. *Id.* at 40.

Once the LWDA notified Rudsell that it did not intend to investigate the violations, Rudsell amended his complaint to seek civil penalties under PAGA. Dkt. 1 at 34-35, 39. In spring 2013, Swift moved to stay Rudsell's case pending the resolution of the *Burnell* action, explaining that it had already produced extensive discovery and was preparing for class certification proceedings in the other case. Dkt. 16 at 7. Swift

also sought a stay pending the resolution of Ninth Circuit proceedings on the question whether federal law preempts California meal and rest break statutes. *Id.* at 10.[2] The district court granted the stay, despite Rudsell's opposition. Dkt. 26.

## II. The parties litigate the drivers' claims for several years.

### A. Novel questions of federal preemption are repeatedly raised.

All the while, the *Burnell* case continued apace. In spring 2013, Swift moved for partial judgment on the pleadings, asserting that federal law preempted California's meal- and rest-period laws. Dkt. 70. Over the plaintiffs' opposition, the district court granted the motion. Dkt. 73, 82. The plaintiffs appealed. Dkt. 108.

Swift then filed yet another motion to stay the *Burnell* case in light of the pending Ninth Circuit proceedings, raising the same federal preemption arguments. Dkt. 87. The district court, however, was unpersuaded that further delay was warranted and denied the motion. Dkt. 103 at 7.

Around the same time, Burnell sought to amend the complaint to add Gilbert Saucillo as a named plaintiff. Dkt. 92. The district court granted the request over

---

[2] Pending in the Ninth Circuit were *Dilts v. Penske Logistics LLC* and *Campbell v. Vitran Express, Inc.*, which presented the question whether California's meal and rest break laws were preempted by the Federal Aviation Administration Authorization Act of 1994. In *Dilts*, this Court concluded that the state statutes were *not* preempted by the federal statute and then reversed and remanded both cases for further proceedings. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 650 (9th Cir. 2014); *Campbell v. Vitran Express, Inc.*, 582 F. App'x 756, 757 (9th Cir. 2014).

Swift's opposition. Dkt. 98; Dkt. 103; Dkt. 107. Pollock withdrew as a class representative due to his unavailability. Dkt. 94; Dkt. 105.

While the plaintiffs' appeal was pending, Swift filed another motion for judgment on the pleadings, this time to challenge the minimum-wage claims. Dkt. 113. Swift asked the district court to hold that federal law preempted not only the meal- and rest-break claims, but also the claims asserting that the drivers were not paid minimum wage for the work they did for Swift. *Id.* at 19-20. Swift also moved for judgment on all "derivative" claims—namely, the plaintiffs' claims that Swift had failed to timely furnish accurate wage statements and timely pay earned final wages, engaged in unfair competition, and violated PAGA. *Id.* In support, Swift pointed to a recent California district-court decision that had concluded that that such minimum-wage claims were preempted by federal law. *Id.* at 9. This time, however, the district court denied Swift's motion. Dkt. 122. The viability of the plaintiffs' claims remained uncertain.

In 2014, this Court provided a measure of clarity, concluding that the Federal Aviation Administration Authorization Act does not, in fact, preempt California's meal- and rest-period laws. *Dilts*, 769 F.3d at 650. In light of this holding, this Court vacated the district court's order granting partial judgment on the pleadings for Swift and remanded the *Burnell* case for further proceedings. Dkt. 126; Dkt. 127.

10

Yet, that was not the end of the story. In December 2018, the Federal Motor Carrier Safety Administration issued a determination that California's meal- and rest-break laws, as applied to certain classes of commercial motor vehicle drivers, are preempted by federal law. Dkt. 197 at 15-16; Dkt. 193. In March 2019, the federal agency announced that its preemption determination was intended to apply retroactively to all pending litigation. Dkt. 193 at 25; Dkt. 193-2. The effect of these pronouncements on pending litigation was the subject of vigorous debate and litigation across California, with the prospect of wiping out the plaintiffs' claims. Dkt. 193 at 25-26.

## B. The parties engage in discovery and class-certification proceedings.

The parties, for their part, plowed ahead. Putting the contested preemption issue aside, they engaged in multiple meet-and-confers and extensive discovery in preparation for class-certification proceedings. *See, e.g.*, Dkt. 70. Among other things, discovery involved the production of payroll documents, Department of Transportation logs, driver logs, employee handbooks, and other corporate policy documents relating to the company's pay schemes. Dkt. 197 at 14-15; Dkt. 227-2 at 3-4. The plaintiffs deposed Swift's corporate witnesses as well as third-party witnesses—including, for instance, representatives from the company that provided the computer software and hardware used to record time in Swift's trucks. Dkt. 227-2 at 3-4. Swift, for its part, deposed the proposed class representatives. Dkt. 227-2 at

11

15. In total, more than one million pages of documents were produced and at least 14 depositions were taken. Dkt. 10-4 at 20. Discovery took place in the *Rudsell* action before it was stayed as well. Dkt. 197 at 15.

In early 2016, the *Burnell* plaintiffs moved for class certification, which the district court initially denied. Dkt. 136; ER310-27. The plaintiffs' efforts were far from fruitless—the court found, for instance, that it was undisputed that Swift did not pay drivers additional compensation for certain non-driving duties. ER315. In the district court's view, however, it was not yet evident whether the drivers would be able to prove that common issues predominated. Dkt. 197 at 7, 10, 14-15. The plaintiffs sought this Court's review of the ruling but were unsuccessful. *Id.* at 7, 14.

## III. After a decade of extensive discovery and protracted litigation, the parties finally reach a settlement agreement.

### A. The parties agree to settle their claims and consolidate their cases.

After class certification was denied, the parties attended a full-day mediation with experienced employment mediator Mark Rudy in April 2018. Dkt. 197 at 16. The plaintiffs in the *Rudsell* and *Burnell* cases jointly participated in the mediation, seeking to resolve their claims. *Id.*

Although the matter did not resolve that day, the parties continued telephonic discussions under the auspices of the mediator, eventually arriving at a mutually

agreeable settlement. The parties hammered out the terms and conditions of the settlement agreement over the following months. *Id.*

The matter did not, of course, end there. Once the parties had drafted their settlement agreement, they had to take it to the district court for its approval. The district court declined to bless the parties' compromise before closely scrutinizing the terms of the agreement.

In June 2019, the district court lifted the stay of the *Rudsell* action, agreed to consolidate the cases led by Saucillo and Rudsell, and permitted the filing of a consolidated complaint that would result in a global settlement.[3] Dkt. 190. This consolidated complaint claimed that Swift had failed to pay minimum wages for all hours worked, ensure duty-free meal and rest periods, reimburse all necessary business expenses, use lawful payment instruments, provide accurate wage statements, and timely pay earned wages when employment ended. Dkt. 204 at 3-4. These claims were brought on behalf of all Swift drivers who were employed to work in California and earned mileage-based compensation between March 22, 2006, and January 31, 2019. *Id.* In addition to statutory damages, the drivers sought civil penalties under PAGA on behalf of the state, which had opted not to investigate the

---

[3] In June 2019, the parties agreed to remove Burnell from his role as class representative when they lost contact with him; Saucillo remained a named representative. Dkt. 186 at 4; Dkt. 188.

company's violations. Dkt. 204 at 18-19. The settlement would resolve all of the principal claims these drivers had raised. Dkt. 197 at 7.

The proposed settlement required Swift to pay $7,250,000. Dkt. 197 at 12. Each class member would receive a share of the settlement proportionate to his or her respective share of the total number of workweeks worked by the class. *Id.* at 18. Because the parties already had the information necessary to determine the class members' workweeks and locations, class members would not need to submit claim forms to receive their share. Dkt. 197 at 12. Each class member would simply receive a settlement check in the mail unless he or she opted out of the settlement. *Id.* Additionally, the settlement allocated $500,000 to be paid to the LWDA as civil penalties for the PAGA claims. *Id.* at 17.

The other terms of the proposed settlement were fairly standard. At final approval, class counsel were permitted to request up to one-third of the total settlement to cover their fees and up to $75,000 to indemnify reasonable costs and expenses, subject to court approval and itemization of these expenditures. Dkt. 197 at 17-18, 30. The two class representatives would receive $5,000 each for time and resources spent participating in the litigation and representing the class's interests. Dkt. 197 at 18; Dkt, 255 at 2. And the settlement administrator would be reimbursed for costs up to $100,000. Dkt. 197 at 30.

The parties agreed to notify the class members of the settlement by mail, using Swift's records of their last known addresses. Dkt. 197 at 29. The proposed notice would explain the nature of the case, the class certified for settlement, the claims at issue, the process for objecting to or opting out of the settlement, and the effect of the settlement on class members' rights. *Id.* at 30.

Under the Class Action Fairness Act, the parties provided notice of the proposed settlement to the U.S. Attorney General and the attorney general of each state in which a class member lives. Dkt. 200-2 at 3.

## B. The plaintiffs seek preliminary approval of their settlement agreement, detailing the roadblocks to recovery.

Once the parties had agreed to these terms, they sought the district court's preliminary approval of the settlement. Dkt. 197. The parties provided the district court with memoranda and detailed declarations explaining how they had arrived at the value of the settlement. Dkt. 197; Dkt. 199 (Swift's non-opposition to plaintiffs' preliminary approval motion). The plaintiffs described the uphill battle they faced: the district court had already denied class certification in this case and several similar ones; in another case of this kind, the plaintiff had already been denied summary judgment; there remained the possibility that certain claims would be deemed preempted under federal law based on the federal government's recent preemption determination; and it was not clear that the plaintiffs would prevail at trial or on appeal. With all this in mind, the parties sought to settle the claims.

The parties emphasized that any estimate of Swift's maximum possible exposure necessarily presumed that the drivers would succeed on each one of their claims at each stage of the case—far from a sure bet. For settlement purposes, the parties ballparked the company's total potential exposure at $211 million, beginning with an approximation of the value of the drivers' unpaid wages claims. Dkt. 193 at 27. The drivers believed their strongest claims were for unpaid time spent on pre-and post-trip inspections, followed by the claims for unpaid time spent waiting for loads, fueling, and completing paperwork. Dkt. 197 at 20. According to the drivers, this amounted to roughly 20 minutes per day for inspections, 30 minutes per day waiting, 15 minutes per day fueling, and 5 minutes per day completing paperwork—a total of approximately 70 minutes per day, per driver. *Id.* With an estimated 2,500 drivers incurring roughly 70 minutes of unpaid time per day, the parties estimated that the total unpaid wages could reach up to $96 million over 13 years. *Id.* The parties cautiously estimated the meal- and rest-break claims to be worth roughly the same amount. Dkt. 193 at 27.

In connection with the claims that Swift had provided inaccurate wage statements to class members, the parties estimated that each of the roughly 19,000 drivers in the class had claims that averaged, at most, $1,000, totaling $19 million of maximum exposure on these claims. Swift made clear, however, that if these claims were taken to trial, it would argue that the alleged violations were not knowing or

intentional and that recovery was therefore completely barred. Dkt. 197 at 21-22. Finally, the parties estimated the value of the penalties associated with not timely receiving wages at termination to be $100,000. *Id.* at 22.

These numbers, though estimates of Swift's maximum total exposure from the drivers' claims, were not haphazardly generated. Rather, the parties explained that the estimates resulted from the parties' extensive analysis of documents that Swift had produced in discovery and intricate damages models that the parties had developed for use in their settlement negotiations. Dkt. 227-2 at 4.

The drivers nevertheless faced serious roadblocks to recovery. For starters, the district court had already denied class certification once in the *Burnell* case. ER310-27. To proceed on their claims, the drivers would need to convince the court to change its mind, with the knowledge that, after denying certification in the *Burnell* case, the same court had denied certification in two other, substantially similar cases against Swift (the *Mares* and *McKinsty* actions). Dkt. 197 at 8-9. Each time, this Court had declined to review the district court's orders. Dkt. 193 at 24. Decertification remained a risk as well: the very court that was overseeing the *Burnell* and *Rudsell* actions had recently decertified a similar wage-and-hour case brought by truck drivers. Dkt. 197 at 9. The court had also granted summary judgment in favor of Swift on meal- and rest-break claims in the *Mares* action (filed by objector Sadashiv Mares). Dkt. 197 at 9; Dkt. 197 at 19. In another, similar case brought against a different

17

trucking company, the same district court had also granted summary judgment on not only the meal- and rest-break claims but also on the unpaid wages claims. Dkt. 197 at 19.

Then there was the prospect of a court deeming the plaintiffs' claims preempted by federal law. After this Court held that the Federal Aviation Administration Authorization Act did not preempt California's meal- and rest-break laws, the trucking industry went to Congress to seek legislative relief from wage-and-hour actions by truck drivers. Dkt. 197 at 7-8. After those efforts failed in Congress, the trucking industry petitioned the Federal Motor Carrier Safety Administration for a determination, under the agency's delegated authority, that California's meal- and rest-break laws are preempted by federal law for certain kinds of commercial motor vehicle drivers. Dkt. 197 at 7-8; Dkt. 193-1. Soon thereafter, the federal agency did as it was asked and issued a determination that California's meal- and rest-break laws are preempted by federal law for particular classes of drivers. Dkt. 193-1. In seeking settlement approval, the plaintiffs explained that, if the agency's determination was upheld in court, it ran the risk of vitiating their claims, raising the specter of *no* relief at all. Dkt. 197 at 7-8.[4]

---

[4] This is in fact what happened. A panel of this Court upheld the Federal Motor Carrier Safety Administration's preemption determination. *See Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 845 (9th Cir. 2021).

According to the plaintiffs, the proposed settlement of $7.25 million allowed them to guarantee more than 19,000 drivers relief for harms suffered from Swift's labor practices, without risking zero recovery if the claims were fully litigated. Dkt. 197 at 22. The settlement included $500,000 in civil penalties under PAGA, which the drivers sought to recover on behalf of the state after it had declined to prosecute Swift's violations. Dkt. 197 at 23-24. Of that $500,000, three-quarters ($375,000) would go to the state and one-quarter ($125,000) would be distributed to the class members. The PAGA claims were just as difficult to value as the others, because, the plaintiffs explained, to prevail on the PAGA claims at trial, the plaintiffs would first need to prevail on the underlying claims. *Id.* at 24. Yet the parties viewed the allocation of $500,000 as fairly substantial, particularly in comparison to other cases in which courts had approved lower PAGA penalties in settlements. Dkt. 200-1 at 3. As a failsafe, the parties explained that they would notify the LWDA about the settlement, and the agency could express any concerns it might have to the court. Dkt. 197 at 24; Dkt. 202-1 at 2. The plaintiffs estimated that the settlement would result in at least a total of $4,273,333 for the class as a whole, which translated to an average award of more than $200 per driver. Dkt. 193-4 at 1.

The district court did not rubber stamp the proposed settlement. Instead, the district court asked the parties for additional support "for a finding that the overall settlement amount is fair, adequate, and reasonable in light of the estimated value of

the case should the Plaintiffs proceed at trial" and accordingly ordered the parties to provide supplemental briefing on "(1) certification of the proposed class for settlement purposes and (2) the fairness, adequacy, and reasonableness of the settlement." Dkt. 192.

The parties delivered. Dkt. 193. In support of conditional certification of the class for settlement purposes, the parties explained that the class was sufficiently numerous because there are over 19,000 drivers in the class and that common questions about Swift's employment policies and practices predominated. Dkt. 193 at 8, 12-14, 17-18. The parties highlighted numerous other cases in which similar questions were deemed to have satisfied the commonality requirement for settlement purposes. *Id.* at 14-15. Moreover, the parties explained, Saucillo and Rudsell were typical and adequate class representatives, because they were subject to the same policies and procedures as the other settlement class members. *Id.* at 9, 15-16.

The parties also elaborated on the significant hurdles that they would face in taking their case to trial. Dkt. 193 at 19-28. The parties underscored that the settlement resulted from adversarial, arm's-length negotiations that took place over the course of more than a year. *Id.* at 21. The negotiations, they explained, accounted for the changing legal landscape the parties faced. For one, class certification remained a challenge. The district court had not only denied class certification in three cases of this kind, but in each case, this Court had denied the plaintiffs' petitions for

permission to appeal the district court's ruling. *Id.* at 23-24. The possibility of categorical federal preemption of the plaintiffs' claims kept rearing its head as well. After the Federal Motor Carrier Safety Administration determined that federal law preempted California's meal- and rest-break laws as applied to certain classes of truck drivers, two federal courts in California had concluded that the agency's determination was retroactive and dispositive of drivers' meal- and rest-break claims and final resolution had remained pending in this Court. *Id.* at 25.

Two drivers who had separately brought cases against Swift expressed their dissatisfaction with the settlement by filing objections to the motion for preliminary approval. The first, Lawrence Peck, asserted that the parties were not permitted to include particular claims under PAGA in the settlement, raising some of the same objections he now makes on appeal. The second, Sadashiv Mares, questioned the size of the settlement and the parties' estimate of Swift's exposure. ER237-44.

### C. The district court grants preliminary approval of the settlement.

The district court granted preliminary approval. Dkt. 212. The court conditionally certified the class for settlement purposes and concluded that the parties had reached a settlement through a fair, non-collusive process. *Id.* at 3-9. The court found "[b]oth sides were represented by experienced counsel, each with a comprehensive understanding of the strengths and weaknesses of the claims and defenses." *Id.* at 9. The court also approved the overall settlement amount as fair,

reasonable, and adequate, noting that "[p]laintiffs would face significant obstacles not only with certifying the class but also surviving summary judgment on all claims and ultimately prevailing at trial." *Id.* at 12. The court therefore concluded that the settlement fell within the "range of reasonableness considering the risk attendant with further litigation and the early stage of this litigation." *Id.*

Even so, the district court noted its disapproval of two aspects of the settlement. First, the court said that it was disinclined to award attorney's fees in an amount greater than one-fourth of the total settlement, absent a showing of extraordinary efforts by counsel. Dkt. 212 at 9-10. Second, the court explained that smaller service awards to each of the two class representatives might be more appropriate. *Id.* at 10-11. The court nevertheless deferred a final decision on both fronts until final approval. *Id.* at 11.

Finally, the district court dismissed Peck and Mares's objections as both premature and unpersuasive. Dkt. 212 at 12-13. The court found "Peck's objections regarding potential class certification and the overall fairness of the award" to have been adequately "addressed by the Court-ordered supplemental briefing." *Id.* at 13. And the court concluded that Mares's objections regarding the settlement "f[e]ll beyond the scope of the inquiry at the preliminary approval stage regarding whether the amount falls within the range of possible approval," which the court found satisfied. *Id.*

**D.  The district court grants final approval of the settlement and rejects a small number of objections.**

Notice of the settlement was sent to 19,544 class members. Dkt. 219 at 3, 6-12. Only eleven opted out and four filed objections (collectively comprising less than 0.08 percent of the class). Dkt. 227-1 at 10. The settlement administrator reported that 339 notices were undeliverable. Dkt. 236 at 10; Dkt. 219 at 3. In total, 19,194 drivers—98.2% of the class—will receive compensation as part of the settlement. Dkt. 236 at 10.

The plaintiffs sought final approval of the settlement. Dkt. 227. The terms of the settlement were essentially unchanged from preliminary approval. Dkt. 227-1 at 12. The total settlement amount remained $7.25 million—of which the plaintiffs sought up to $2,416,666.67 (one-third) for attorney's fees, $67,551.61 for litigation costs, $5,000 for each of the class representatives, $100,000 for class administration costs, and $500,000 in civil penalties under PAGA. *Id.* Each class member's share would be equal to the fraction of the net settlement fund proportionate to the fraction of the total workweeks worked by all class members during the class period that that individual worked. *Id.* The plaintiffs estimated that participating class members would receive an average payment of $217.50, with the largest payment estimated to be $3,458.17. Dkt. 227-1 at 12-13. The plaintiffs again underscored the risks of proceeding to trial on the claims, explaining that the legal landscape had not changed in their favor. *Id.* at 15-16.

The district court granted final approval. Dkt. 236. Applying this circuit's well-established standard for determining whether a class action settlement is fair, adequate, and reasonable, the court concluded that the settlement easily passed the test. Specifically, the court weighed "(1) the strength of the plaintiffs' case, (2) the risk, expense, complexity, and likely duration of further litigation, (3) the risk of maintaining class action status throughout the trial, (4) the amount offered in settlement, (5) the extent of discovery completed and the stage of the proceedings, (6) the experience and views of counsel, (7) the presence of a governmental participant, and (8) the reaction of the class members to the proposed settlement." Dkt. 236 at 3-4 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). All of these factors, the court found, favored approval. Dkt. 236 at 14.

In granting approval, the district court highlighted the distinctive challenges that the case presented. First, the court noted that it had already denied class certification in "several similar trucking cases, indicating that success on the merits was by no means certain." Dkt. 236 at 6. Second, the court explained that the litigation had gone on for nearly a decade and continued to have "the potential to impose enormous litigation costs on all of the parties." *Id.* (internal quotation marks omitted). Third, the court recognized that the Federal Motor Carrier Safety Administration's preemption determination runs the risk of "mak[ing] the class's claims worth very little." *Id.* In light of the drivers' "substantial risk of incurring the

24

expense of trial without any recovery," the court concluded settlement approval was appropriate. *Id.*

The court likewise reaffirmed its earlier approval of the overall settlement amount. The court explained that a proposed settlement may be fair, adequate, and reasonable within the bounds of the law even if "greater recovery *might* be available to the class members at trial." Dkt. 236 at 7 (emphasis added). Thus, even if the settlement is on the "low end of what Plaintiffs estimate their claims could be worth," the court found it fell well "within the range of reasonableness." *Id.* In so holding, the court emphasized this circuit's longstanding policy of deference to parties' private consensual decisions in the context of class settlements as favoring approval. *Id.* (citing *Hanlon*, 150 F.3d at 1027).

As to the other factors relevant to approval, the court explained that the case had been "heavily litigated," which had allowed the parties to gather enough information to "make an informed decision" about settlement. Dkt. 236 at 7-8. The court also pointed to established circuit case law that explained that class counsel's experience and efforts to litigate the case made them "better positioned than the Court to produce a fair settlement." Dkt. 236 at 8 (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009)). What's more, the state had opted not to object to or intervene in the case, even after having been notified of Swift's violations, the

drivers' intent to pursue penalties under PAGA, and the proposed settlement. This, too, weighed in favor of approval. Dkt. 236 at 9-10.

Also weighing in favor of approval, the district court found, was the small number and insubstantial nature of the objections and exclusions from the settlement, which "raises a strong presumption" that the settlement is "favorable to the class members." Dkt. 236 at 10 (internal quotation marks omitted). The court found the handful of objections unpersuasive, addressing each objection in detail in its order. Dkt. 236 at 11. Mares's objection again centered on his claim that the parties had underestimated Swift's maximum possible exposure. Dkt. 236 at 11; ER208-20. The court was unconvinced. It explained that it had twice found the total settlement amount fair, reasonable, and adequate, as well as sufficiently supported by evidence from the parties. Dkt. 236 at 12. The court also rejected Mares's specific contention that the parties had erred in estimating Swift's exposure on the basis of an estimated 850,000 workweeks worked by the class, finding that the evidence in the record from Swift's payroll director showed Mares was "plainly wrong." *Id.*

In addition, the court again dismissed Peck's claim that the parties could not settle the PAGA claim that flowed from Swift's practices on the grounds they had not adequately exhausted administrative remedies. Dkt. 236 at 14; Dkt. 213. The court once again found the argument "not well-taken," explaining that administrative

26

exhaustion is not a prerequisite for standing. Dkt. 236 at 14. The court found the PAGA penalty sufficient as well. *Id.*

The court likewise rebuffed the objections of two drivers who had asked the court to carve out the claims of Swift hostlers from the settlement. Dkt. 236 at 12; Dkt. 216. The court held that the settlement is lawfully limited to the claims of Swift drivers who were paid mileage-based compensation and that the claims of Swift hostlers could be properly released to the extent they earned mileage-based pay. Dkt. 236 at 13-14. The scope of the release and its impact on future litigation involving hostlers' wage-and-hour claims would, the court held, be decided in the separate cases brought by hostlers, in which the parties had conducted significant discovery and motion practice. *Id.* at 12.

Finally, despite the parties' agreement to permit a higher award, the district court declined to award class counsel fees exceeding 25 percent of the total settlement. Dkt. 236 at 22-23. The court trimmed the award for litigation costs as well, awarding $61,630.48 for expenses. *Id.* at 24. The court ultimately agreed, however, that the $5,000 service awards were appropriate for the two class representatives, in light of their declarations attesting to their involvement in the litigation, the risks of headlining an employment class action, and awards in similar suits. *Id.* at 25.

**E.    This Court vacates and remands to the district court, which once again approves the proposed settlement—this time under a heightened fairness standard.**

Objectors Mares and Peck appealed the approval of the settlement to this Court. Dkt. 250; Dkt. 240. Without addressing the merits, a panel of this Court held that the district court had erred by failing to explicitly "cite or otherwise acknowledge" this Court's precedent requiring "a heightened fairness inquiry prior to class certification." *Saucillo*, 25 F.4th at 1131 (quoting *Roes*, 944 F.3d at 1048)). The panel therefore "remanded so that the district court could make findings in accordance with the applicable heightened standard," but otherwise "offered no opinion as to the merits of Mares's allegations," *id.*, and did not question the fairness, reasonableness, or adequacy of the settlement.

On remand, the district court requested briefing from the parties on how to faithfully apply this Court's opinion. ER 15. The district court then explicitly applied a "higher standard," this time making clear that it would not "presume[]" fairness in the absence of a certified class. The court thus conducted a "probing inquiry," issuing an extensive and exhaustive 36-page opinion reevaluating each of the eight *Hanlon* factors, and found that the settlement agreement was "the product of non-collusive, arms-length negotiation." ER 17. The district court's review also concluded that the proposed class settlement exhibited "no signs of direct or subtle collusion." ER 18. The court maintained the overall settlement amount, incentive awards for class

representatives, settlement administration costs, and PAGA fees, but this time it trimmed the attorneys' fees by 8.33% to comport with this Court's benchmark. ER 15. After a renewed review of the terms and litigation history of the class settlement, new briefing from both parties, reconsideration of objections, an explicitly-stated inquiry under *Roes*, and an effectively *de novo* review of the *Hanlon* factors and the request for attorneys' fees, costs, and class representative enhancement, the district court gave final approval to the settlement. ER 42.

## SUMMARY OF ARGUMENT

The district court acted well within its discretion when it approved the $7.25 million class settlement in this case as fair, reasonable, and adequate. The settlement secured compensation for more than 19,000 Swift drivers who alleged that the company had failed to timely pay wages, provide meal and rest breaks, reimburse business expenses, use lawful payment instruments, and more. The court found that the settlement guaranteed substantial relief for these drivers, especially in light of the risks they faced in pursuing recovery through litigation.

The district court was not new to this beat. It had presided over the case for nearly ten years, during which the drivers had conducted extensive discovery, fought against multiple federal preemption challenges, filed multiple appeals in this Court, and eventually sought class certification, albeit unsuccessfully. The court was well acquainted with the strengths and weaknesses of each side's case and had a

comprehensive understanding of what further litigation entailed. Among other things, the drivers faced the prospect of Swift asserting federal preemption (again) and the court declining to certify a class (again). Either would foreclose recovery altogether. After weighing the considerable risks of further litigation against the meaningful relief afforded by the parties' agreement, in the context of the heightened standard required of settlements reached before class certification, the court approved the settlement.

The lone objector strives in vain to find fault with this hard-won settlement. He tries to dispute the district court's finding that the settlement was the result of fair, informed, and arm's-length negotiations between the parties and not the product of collusion. Unable to identify any actual evidence of collusion in the ten-year record of this litigation, the objector simply alleges that various aspects of the settlement are "red flags." But calling the settlement suspicious does not make it so. The mere fact that the parties settled the case after class certification was denied, or that they amended and consolidated their complaints as a part of the settlement process, is hardly a "subtle" sign of collusion. These are common characteristics of class settlements—a far cry from the red flags this Court has cautioned courts to be on the lookout for when scrutinizing settlements.

Lacking any actual evidence of collusion, this objector proclaims his dissatisfaction with the size of the settlement as a reason to overturn it. He does so

by raising a series of questions about the parties' estimate of Swift's maximum exposure on their claims. But, as the district court explained in rejecting this objection below, the parties' estimate was backed by declarations from both parties and was sufficiently detailed to allow the court to conclude the amount was adequate. And any estimate of maximum exposure would inevitably need to be discounted to account for the risks to the plaintiffs of proceeding with the litigation. Consistent with this circuit's case law, the district court appropriately concluded that neither precision nor perfection was necessary to evaluate the parties' settlement and find it fair, reasonable, and adequate under Rule 23.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 23(e)(2), a district court may approve a class action settlement if it finds the settlement is "fair, reasonable, and adequate." Where, as here, "the parties negotiate a settlement agreement before the class has been certified, settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Roes*, 944 F.3d at 1039. This Court's review of a district court's decision to approve a class settlement, however, is "extremely limited." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011) (quoting *Hanlon*, 150 F.3d at 1026). The reviewing court defers to the district court's intimate knowledge of the case, its history, the parties, and the costs and benefits of settlement. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir.

2012) (explaining that the "district court should have broad discretion because it 'is exposed to the litigants, and their strategies, positions and proof' " (quoting *Hanlon*, 150 F.3d at 1026-27)). This deference to the district court dovetails with the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).

For these reasons, a party "seeking to overturn the settlement approval must make a 'strong showing' that the district court clearly abused its discretion." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)). The Court will affirm settlement approval as long as "the district court applied the correct legal standard to findings that are not clearly erroneous." *Id.*

"Both the district court and this court must evaluate the fairness of a settlement as a whole, rather than assessing its individual components." *Lane*, 696 F.3d at 818-19. "[T]he question whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court." *Id.* at 819. "When the issue presented is the substantive fairness of the settlement," this Court "must refrain from substitut[ing] [its] notions of fairness for those of the district judge." *Campbell v. Facebook*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *In re Bluetooth*, 654 F.3d at 950) (internal quotation marks omitted).

## ARGUMENT

The objector does not offer this Court any legitimate basis for upsetting the district court's conclusion that this class-action settlement is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e)—let alone what this Court's cases demand: "a 'strong showing' that the district court clearly abused its discretion." *In re Hyundai*, 926 F.3d at 556 (en banc). To the contrary, the objector's attacks on the district court, and the sufficiency of the evidence on which its review was based, are belied by the exhaustive record prepared by the parties and reviewed by the court below. Mares repeatedly makes unfounded claims of collusion between the two sides' lawyers. But, as the district court recognized, the settlement here bears none of the hallmarks of a settlement in which counsel prioritize their own interests above those of the class. Remarkably, Mares claims that the parties' actions raise suspicion because, after ten years of vigorously litigating the case, they opted to settle it and guarantee recovery for more than 19,000 drivers. Mares Br. at 14, 15, 17. In light of the risks faced over many years, that achievement is to be commended—not greeted with suspicion. As the district court concluded, counsel's efforts resulted in a settlement that provides substantial recovery for these drivers after nearly a decade of litigation.

## I.  The district court applied the correct legal standard on remand.

In the objector's first appeal, this Court ruled that the district court improperly applied a presumption of fairness because it had failed to "cite or otherwise acknowledge our longstanding precedent requiring a heightened fairness inquiry prior to class certification." *Saucillo*, 25 F.4th at 1131. On remand, the district court explicitly "applie[d] a 'higher standard' and conduct[ed] a 'more probing inquiry' in evaluating the fairness of the Settlement Agreement." ER 11. Even after the "exacting review" required of it by *Roes*, 944 F.3d at 1049, the district court yet again found "no signs of overt or subtle collusion." ER 11.

The district court indisputably applied the correct legal standard here, as evidenced by the lack of Mares' objections on this score. As such, the only question that remains on appeal is whether the district court's approval of the settlement is a product of its abuse of discretion. This Court's precedent reinforces that it is not. This Court "will affirm" settlement approval as long as "the district court applied the correct legal standard to findings that are not clearly erroneous." *In re Hyundai*, 926 F.3d at 556. Given the lack of dispute concerning the application of the correct legal standard, the objector must show that the district court's findings are clearly erroneous to prove an abuse of discretion. He is not able to do so here.

34

## II.   The district court weighed all of the relevant factors, including the risks of further litigation and the substantial relief the settlement guaranteed.

For starters, the objector fails to reckon with the district court's searching review of the settlement, which involved the careful weighing of each of the following factors:

> [1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Campbell*, 951 F.3d at 1121 (quoting *Hanlon*, 150 F.3d at 1026).[5] As this Court has explained, the district court may consider some or all of these factors—often referred

---

[5] Rule 23(e)(2), as amended in December 2018, directs courts to consider the following in deciding whether a settlement is fair, reasonable, and adequate: whether

A) the class representatives and class counsel have adequately represented the class;

B) the proposal was negotiated at arm's length;

C) the relief provided for the class is adequate, taking into account:

  (i)   the costs, risks, and delay of trial and appeal;

  (ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

  (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

  (iv)  any agreement required to be identified under Rule 23(e)(3); and the proposal treats class members equitable relative to each other.

D) Because these factors are subsumed by the *Hanlon* inquiry, they are discussed in the context of the district court's *Hanlon* analysis below.

to as the *Hanlon* factors—in evaluating the fairness of a settlement. *Campbell v. Facebook*, 951 F.3d at 1121 (citing *Rodriguez*, 563 F.3d at 963).

The district court found each of the *Hanlon* factors favored approval. ER 4-20. Though the plaintiffs' case had survived nearly a decade of the defendant's challenges, their chances of recovery if they proceeded with the case remained shaky. The district court had already once denied class certification in the *Burnell* action and two similar trucking cases. ER 15. Then, even if the plaintiffs were able to clear the hurdle of class certification, Swift would put them to the test of relitigating whether their claims were preempted. ER 15. The parties have already twice litigated whether plaintiffs' claims are preempted, each time on a different legal theory, and Swift had prevailed in district court at least once. If Swift were to prevail again, the class's claims would be worth "very little," as the district court observed. ER 15. In light of the "substantial risk" of the plaintiffs' "incurring the expense of trial without any recovery," and the likelihood that the parties would incur "enormous litigation costs" if settlement were denied, the court concluded that the first three *Hanlon* factors favored approval. ER 15.

This risk analysis was fundamental to the court's review of the settlement under the remaining *Hanlon* factors. The amount of the settlement, the court concluded, was well within the bounds of reasonableness. ER 16. The parties had estimated number of workweeks worked by the class, the number of drivers in the

class, and the approximate amount of unpaid time worked by the class, and then used those figures to estimate the company's exposure. This estimate then served as the basis for the final settlement amount, which would deliver, on average, more than $200 in relief to each class member. And before agreeing upon this settlement, the parties had completed substantial discovery—including well over a million pages in document production and the depositions of key witnesses on both sides. They had also tested the strength of their claims through two sets of motions for judgment on the pleadings, one round of class certification motions, and multiple trips to this Court. This record was sufficient for the court to conclude that the parties were well informed about the costs and benefits of settlement and adequately positioned to craft a fair agreement. ER 16-17. The experience of class counsel, the state's decision not to participate in the action after having been repeatedly notified of it, and the miniscule number of opt-outs and objections further favored approval. ER 17-20.

The settlement in this case was a paradigmatic compromise. Class counsel negotiated a resolution that provided class members with meaningful compensation for the harms they had suffered while allowing them to forgo the formidable challenge of formally proving those harms in court on a classwide basis. After a close study of the terms of the settlement, the history of the case, the strength of both sides' cases, and the risks of proceeding to trial, the district court approved the settlement.

III. **The district court's careful examination of the settlement uncovered no signs of collusion between counsel and no reason to second-guess the settlement.**

A. **The parties had engaged in fair, informed, and arm's-length negotiations, with the guidance of a skilled mediator.**

Mares's objection lacks any sound basis in the record. First, Mares asserts that the district court "failed to scrutinize the numerous signs indicating that self-interest may have played a key role in the decision to settle." Mares Br. at 1. But the district court did no such thing. The district court found that "the parties engaged in arm's length, serious, informed, and non-collusive negotiations between experienced and knowledgeable counsel," and that they were guided by a skilled mediator. ER11-14; ER 77; *see* ER229. The court then concluded that this finding weighed in favor of approval. This conclusion was entirely consistent with settled circuit precedent.

This Court has long recognized that whether a proposed settlement was negotiated at arm's length is a critical component of the district court's inquiry into whether a proposed settlement is fair, reasonable, and adequate. *Campbell v. Facebook*, 951 F.3d at 1122; *Rodriguez*, 563 F.3d at 965 ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."); *Hanlon*, 150 F.3d at 1026. In fact, Rule 23(e) now expressly requires that a court evaluating whether a settlement is fair, reasonable, and adequate consider whether "the proposal was negotiated at

38

arm's length." Fed. R. Civ. P. 23(e)(2)(B); *Roes*, 944 F.3d at 1049, n.12. This is precisely what the district court did.

Based on the record, the court concluded that the parties engaged in fair, informed, and non-collusive negotiations to arrive at a settlement. ER14. The district court highlighted the fact that the parties had participated in a mediation before settling the case as support for its finding that the settlement was the product of non-collusive, arm's length negotiations. ER14. This Court has explained that the "presence of a neutral mediator" is "a *factor weighing in favor of a finding of non-collusiveness*," even though it "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement." *In re Bluetooth*, 654 F.3d at 948 (emphasis added). In accordance with these principles, the district court observed that the presence of a neutral mediator supported a conclusion that the negotiations were non-collusive, which in turn weighed in favor of approval. But this was only *part* of the court's overall analysis of whether the settlement was fair, reasonable, and adequate—it was not the end of the analysis. The court then proceeded to analyze the *Hanlon* factors in detail, finding that each of these factors supported approval as well. ER14-24. The court at no point concluded that the mere fact that the parties engaged in fair, arm's length negotiations presumptively rendered the Swift settlement fair, reasonable, and adequate. To the contrary, it conducted exactly the

kind of "probing inquiry," under a "heightened standard," that was required by this Court's precedent. ER 11.

Mares goes onto argue, with little basis, that the district court ignored various indicia of collusion in reviewing the settlement. Mares Br. at 10-25. Yet this case features none of the "subtle signs of implicit collusion" that this Court has previously identified as requiring the reversal of settlement approval. *Roes*, 944 F.3d at 1049. The settlement does not feature non-reversionary clauses that would allow unclaimed funds to revert to Swift. *Id.* Such a provision would create incentives for Swift to push for a subpar notice or claims distribution process so that more of the settlement funds would be returned to the company at the end. *Id.* at 1058-59. The Swift settlement, however, is reversionary, which means all funds will be distributed to class members. Nor have the parties promised unduly large incentive payments to class representatives. *Id.* at 1043, n.6, 1049 (criticizing $71,000 in incentive payments to class representatives, which included $25,000 incentive payments to each of two class representatives). Instead, the representatives in this case will receive a standard-fare $5,000 each. And finally, the settlement does not feature a disproportionate cash distribution to the lawyers. *Id.* at 1043, 1049 (criticizing attorney's fees of $950,000 that exceeded class members' recovery of $864,115); *Allen*, 787 F.3d 1224 & n.4 (explaining that award of $1.125 million in attorney's fees appeared disproportionate to class members' recovery of $373,675). To the extent the district court had any

doubts about the size of class counsel's fees, it trimmed them each time it granted settlement approval. ER32-33.

This was more than enough for Rule 23(e). Rule 23(e) does not require the court to demand perfection from a class settlement. It simply calls on the court to scrutinize the proposed settlement to ensure that the interests of all class members are protected by examining the overall settlement for any indicia of collusion between class and defense counsel. None of those indicia are present here.

Mares asserts, without basis, that the parties' settlement of the *Rudsell* action was somehow a "red flag," because the case had been stayed while the parties were negotiating settlement. Mares Br. at 12-14. Contrary to Mares's speculation, however, the stay of the *Rudsell* case was not a cause for suspicion. The parties had actively litigated the *Rudsell* case up until the stay, and Rudsell's lawyers had opposed Swift's motion to stay the action. Nevertheless, the district court had concluded that the claims in the *Rudsell* case were entirely subsumed by the *Burnell* case and therefore that it would not separately adjudicate *Rudsell* action while the *Burnell* case was live. It was only natural, then, that the *Burnell* and *Rudsell* cases would be settled together.

Nor was it a "red flag" that the parties settled the *Burnell* case after class certification was denied, at which point the risk of zero recovery significantly increased. Mares Br. at 14-15. The *Hanlon* inquiry itself, as well as Rule 23(e)(2)(C)(i), recognizes that the risks, expense, complexity, and duration of continued litigation

41

are significant factors favoring approval. Nor was it a "red flag" that the parties filed an amended complaint as part of the settlement process. Mares Br. at 17-19. It is par for the course for parties to do just this. *See, e.g.*, *Campbell v. Facebook*, 951 F.3d at 1113; *Roes*, 944 F.3d at 1040; *Churchill Vill., L.L.C. v. GE*, 361 F.3d 566, 571 (9th Cir. 2004). And finally, the parties' agreement as to attorney's fees comes nowhere close to raising the specter of collusion either; the court closely scrutinized those fees and truncated them as it deemed appropriate. Mares Br. at 15-17; *see also Roes*, 944 F.3d at 1050-51 (noting that clear sailing provisions are not prohibited, particularly when the court engages in close scrutiny of the settlement).

## B.   The settlement amount was sufficiently supported by the record and well within the range of reasonableness.

Mares's final bit of speculation involves posing a string of questions about the parties' estimate of Swift's maximum exposure from the drivers' claims. Mares Br. at 19. Specifically, Mares queries whether the parties calculated Swift's exposure with sufficient precision. Notably, Mares does not dispute that the district court was provided with evidence pertaining to Swift's exposure. Mares himself states that the district court was given data pertaining to the average number of drivers in the class over the thirteen-year class period, as well as the average number of workweeks these drivers worked. *Id.* at 21. Mares instead quibbles with the *quantum* of evidence provided to the court, contending that the court was not given enough to justify the

parties' estimate of Swift's $211 million exposure. *Id.* In approving the settlement, the district court correctly rejected these arguments.

This Court has repeatedly explained that "the question whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court." *Lane*, 696 F.3d at 819 (citing *Hanlon*, 150 F.3d at 1027). The court's review of the parties' private consensual agreement focuses, instead, on deciding whether the agreement is "the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, *taken as a whole*, is fair, reasonable and adequate." *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). There is no evidence of collusion, and the size of the settlement does not suggest otherwise.

Mares's objection is premised on his attempts to reverse-engineer the data underlying the parties rough estimate of Swift's exposure, including the average number of drivers, workweeks, off-the-clock time worked by the drivers, and hourly wage with the goal of discrediting the settlement. Mares Br. at 21-23. But Mares's objections do not withstand scrutiny. In their papers in support of preliminary approval, the parties stated that from 2006 to 2012, the average number of class-member drivers at any given time was approximately 1,600, and that the number later increased to approximately 2,500. ER251. These numbers referred to driver *positions*; over 19,000 individuals were employed *in* these positions during the class

period. *Id.* Mares attempts to dispute these numbers and argue that the number of workweeks separately reported by Swift's payroll director undermines the parties' report as to the average number of driver positions at any given time. Mares's other assorted attacks on the parties' calculations are no more persuasive. *See, e.g.*, Mares Br. at 23-24 (relying on declaration filed in a different case to question the size of the class in this case).[6]

Mares demands perfection from the parties' estimates of the company's exposure to Swift's claim where perfection is not needed. This Court has never required parties to litigate their cases to exaction before seeking settlement, even for purposes of determining the defendant's exposure. Were it to do so, parties in class action lawsuits would be forced to sift through discovery to attempt to determine the exact maximum value of each class member's claims. In a case like this one, that would require identifying the number of workweeks each driver worked over periods of time, the mileage-based pay rate for each shift, the number of minutes each driver was off-the-clock in each shift, and more. This would be a daunting, if not impossible, task—requiring the equivalent of a mini damages trial on each class member's

---

[6] Mares repeatedly suggests that questions about the size of the class supply grounds to throw out the settlement. This is baseless. For starters, the district court did, over a decade of litigation, carefully scrutinize the size of the class. The court evaluated the class's numerosity on multiple occasions, and although it denied certification, it found the numerosity requirement to be "satisfied." ER 313. More importantly, the district court considered the total size of the class in the context of the fairness of the class settlement at the preliminary approval stage. ER 252.

claims. And in practice, requiring parties to engage in this kind of proving-up of their damages could preclude settlement altogether.

Nor would it be particularly useful to require the parties to calculate to precision the defendant's exposure in light of the indeterminate risks that must be factored in before settlement. The parties' estimate of maximum exposure assumes that the drivers would prevail at every turn in the case, which remains highly unlikely. The parties had to account for the risks of being denied class certification, having the claims dismissed before trial, losing at trial, and being reversed on appeal. As the district court observed, the risks were particularly salient in this case, in light of the facts that the district court had thrice denied class certification on these types of claims and that the defendants were renewing their preemption defenses. Therefore, the parties substantially discounted the maximum total exposure to account for these risks, ultimately arriving at a settlement amount of $7.25 million, which translated to an average award of more than $200 per driver.

These risks are exceedingly difficult to quantify, and yet must be factored into the court's evaluation of whether the settlement is fair, reasonable, and adequate. In other words, even a perfect estimate of Swift's maximum exposure on the drivers' claims would need to be discounted by an inexact risk factor before the court could evaluate whether the overall settlement amount was reasonable. This means that

even a perfect estimate of Swift's maximum exposure would not necessarily indicate whether the settlement amount is fair, reasonable, and adequate.

This is precisely why neither this Court nor Rule 23(e) has never required the parties to a class action settlement to prove the defendant's maximum exposure with utmost precision. Instead, this Court defers to the district court's discretion in evaluating the reasonableness of the settlement. *See Officers for Justice*, 688 F.2d at 626 ("Great weight is accorded [to the district judge's] views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly."). Here, the district court was intimately familiar with the contours of the plaintiffs' claims, having presided over not only the *Burnell* and *Rudsell* cases but several related cases as well, and reasonably exercised its discretion in finding the settlement amount to be fair, reasonable, and adequate.

The district court applied the correct legal standard and properly exercised its discretion to approve this class settlement for the second time. All relevant factors, following decades of litigation in the face of substantial risk, demonstrate that the settlement is fair, adequate, and reasonable. The mere fact that one class member of out thousands disagrees cannot, on its own, require reversal.

## CONCLUSION

The district court's judgment should be affirmed.

November 18, 2022                    Respectfully submitted,

                                     _/s/ Deepak Gupta_
                                     DEEPAK GUPTA
                                     GUPTA WESSLER PLLC
                                     2001 K Street NW, Suite 850 North
                                     Washington, DC 20006
                                     (202) 888-1741
                                     *deepak@guptawessler.com*

                                     JAMES R. HAWKINS
                                     GREGORY MAURO
                                     JAMES HAWKINS APLC
                                     9880 Research Drive, Suite 200
                                     Irvine, CA 92618

                                     STANLEY D. SALTZMAN
                                     MARIN & SALTZMAN, LLP
                                     29800 Agoura Road
                                     Agoura Hills, CA 91301

                                     *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This response brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 11,321 words. It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

November 18, 2022

*/s/ Deepak Gupta*
Deepak Gupta

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2022, I electronically filed the foregoing brief with Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Deepak Gupta
Deepak Gupta