**Case No. 22-55560**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

GILBERT SAUCILLO; JAMES R. RUDSELL, on behalf of themselves and all others similarly situated,
Plaintiffs – Appellees,
and
JOHN BURNELL; JACK POLLOCK
Plaintiffs
v.
SADASHIV MARES,
Objector – Appellant
v.
SWIFT TRANSPORTATION COMPANY OF ARIZONA, LLC, an Arizona Corporation,
Defendants and Appellees
and
SWIFT TRANSPORTATION COMPANY, ET AL.
Defendants

_____

On Appeal from the United States District Court,
for the Central District of California
D.C. No.: 5:10-CV-00809-VAP-OPx

_____

**OBJECTOR – APPELLANT'S REPLY BRIEF**

_____

Joseph Clapp, Esq., SBN 99194
AIMAN-SMITH & MARCY
7677 Oakport Street, Suite 1150
Oakland, California 94621
510/590-7115
510/562-6830 fax
jc@asmlawyers.com
Attorneys for Objector – Appellant SADASHIV MARES

**TABLE OF CONTENTS**

A SKEPTICAL COURT WOULD HAVE DEMANDED SOME
ANSWERS. ...................................................................................1

I. THE DISTRICT COURT DIDN'T ASK WHY SWIFT CHOSE TO
NEGOTIATE WITH THE WEAKEST LINKS. ..............................2

II. THE DISTRICT COURT DIDN'T ASK WHY THE SETTLEMENT
AGREEMENT CONTAINED TERMS THAT WERE UNJUSTIFIABLY
FAVORABLE TO SWIFT. ............................................................5

   A. The Settlement Agreement Released Newly-Added, Unlitigated PAGA
   Claims. ...................................................................................5

   B. The Settlement Agreement Contained a Clear Sailing Provision. ...............8

III. THE DISTRICT COURT DIDN'T ASK WHY THE EXPOSURE
ESTIMATE MADE NO SENSE. ....................................................11

IV. THE DISTRICT COURT DIDN'T ASK WHY THERE WERE ONLY
19,544 CLASS MEMBERS. ..........................................................14

CONCLUSION. ...............................................................................17

# TABLE OF AUTHORITIES

## CASES

*Allen v. Bedola,* 787 F.3d 1218 (9th Cir 2015)................................................. 8, 9, 10

*Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935 (9th Cir. 2011) ............. 3, 9, 10

*Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014)....................................3

*Green v. Northrop Corp.,* 59 F.3d 953 (9th Cir. 1995) ...............................................7

*Lewis v. Simplified Labor Staffing Solutions, Inc.* (2022) 85 Cal.App.5th 983 .........8

*Negrete v. Allianz Life Ins. Co. of North* America, 523 F.3d 1091 (9th Cir. 2008) ...3

*Online DVD-Rental Antitrust Litigation,* 779 F.3d 934 (9th Cir. 2015).....................7

*Peck v. Swift Transportation Co. of Arizona,* 2:17-cv-06173 .......................... 15, 16

*Peck v. Swift Transportation,* Riverside Superior Court Case No. 1411184 ..........15

*Rodriguez v. West Publ. Corp.*, 563 F.3d 948 (9th Cir. 2009) ...............................8, 9

*Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019)............................. 10, 13

*Saucillo v. Peck,* 25 F.4th 1118 (9th Cir. 2022)..........................................................7

*Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906 (2022) ................................7

*Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991).........10

## STATUTES

Labor Code § 200....................................................................................................6

Labor Code § 201....................................................................................................6

Labor Code § 201.3 ................................................................................6

Labor Code § 201.5 ................................................................................6

Labor Code § 202 ...................................................................................6

Labor Code § 203 ...................................................................................6

Labor Code § 204 ...................................................................................6

Labor Code § 205.5 ............................................................................6, 7

Labor Code § 210 ...................................................................................6

Labor Code § 212 ...................................................................................6

Labor Code § 216 ...................................................................................6

Labor Code § 218 ...................................................................................6

Labor Code § 218.5 ................................................................................6

Labor Code § 218.6 ................................................................................6

Labor Code § 222 ...................................................................................6

Labor Code § 222.5 ................................................................................6

Labor Code § 223 ...................................................................................6

Labor Code § 224 ...................................................................................6

Labor Code § 225 ...................................................................................6

Labor Code § 225.5 ................................................................................6

Labor Code § 226 ...................................................................................6

Labor Code § 226.7 ................................................................................6

Labor Code § 226.8.................................................................6

Labor Code § 227.3.................................................................6

Labor Code § 2698.................................................................6

Labor Code § 2699.................................................................6

Labor Code § 450.................................................................6

Labor Code § 510.................................................................6

Labor Code § 511.................................................................6

Labor Code § 512.................................................................6

Labor Code § 516.................................................................6

Labor Code § 558.................................................................6

Labor Code § 1174.................................................................6

Labor Code § 1174.5.................................................................6

Labor Code § 1194.................................................................6

Labor Code § 1194.2.................................................................6

Labor Code § 1196.1.................................................................6

Labor Code § 1197.................................................................6

Labor Code § 1197.2.................................................................6

Labor Code § 1198.................................................................6

## Rules

F.R.C.P. 23(e)(2)(C) ...................................................................................14

F.R.C.P. 23(e)(2)(A) ...................................................................................14

F.R.C.P. 23(f) ..............................................................................................4

**A Skeptical Court Would Have Demanded Some Answers.**

Why did Swift's counsel choose to initiate settlement negotiations with Rudsell's counsel? At that time, the *Rudsell* case had been stayed, and virtually abandoned, for five years. Could the reason be the obvious one—that Swift's counsel sought to negotiate with their weakest adversary?

We do not know. The district court never asked.

Apparently needing assistance, Rudsell's counsel then called Burnell's counsel, who had already lost their certification motion and had virtually abandoned their case. Why, then, did Swift's counsel bother to negotiate with Burnell's counsel for a *class* settlement after *denial* of certification? Again, could it be for the obvious reason?

And again, we do not know, because the district court never asked. Section I.

Nor did the district court pry into any details when presented with problematic terms of settlement. Claims for numerous penalties were added to the case *after* the settlement, with no discovery into the substance nor justification for the release of the claims. The district court never asked why these un-litigated claims were being added and released. In addition, the agreement included a clear sailing provision, benefiting the plaintiffs' counsel and no one else. But the district court never asked why this provision was included. Section II.

1

Moreover, the settling parties provided an estimate of part (not all) of Swift's exposure which was flawed in both its methodology and its assumptions. Again, the district court did not conduct any serious investigation to determine whether this exposure estimate fell within the ballpark of Swift's true exposure. Section III.

Finally, the settling parties presented contradictory estimates of the class size. The settling parties themselves presented evidence that during an almost four-year period, the size of the class was 20,900. The settling parties themselves presented evidence that during an almost thirteen-year period that included this four-year period, the size of the class was 19,544. This mathematical impossibility failed to inspire the district court to inquire whether the plaintiffs' counsel knew or cared enough about the class to adequately represent their interests. Section IV.

Mares will submit that the district court should have thoroughly investigated these subtle signs that self-interest—the lure of a seven-figure fee—might have influenced the plaintiffs' counsels' decision to settle. Mares will submit that the district court should not have approved this inadequate class settlement negotiated by inadequate counsel.

## I. The District Court Didn't Ask Why Swift Chose to Negotiate with the Weakest Links.

A reverse auction occurs when a defendant facing multiple class actions makes a sweet deal with its weakest adversary. *Negrete v. Allianz Life Ins. Co. of*

*North* America, 523 F.3d 1091, 1099 (9th Cir. 2008). A district court is charged with the duty of protecting absent class members from such sweetheart deals. *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 946 (9th Cir. 2011). In the discharge of this duty, shouldn't the district court have attempted to find out why Swift chose to negotiate with two plaintiffs' firms that had apparently lost all interest in pursuing their lawsuits?

That is a question the settling parties do not even try to answer. Instead, they try to rebut the premise of the question, that Rudsell's lawyers and Burnell's lawyers were their weakest adversaries.

Rudsell's counsel had let their case lie dormant for five years at the time of the early-2018 telephone call from Swift's counsel. 2-ER-300:13-15. The settling parties try to explain away plaintiffs' counsel's troubling disinterest in prosecuting their case by pointing out that the case was stayed during that time. Swift Brf. at 19; Plaintiff Brf. at 41. But the reason the *Rudsell* case was stayed was because its class claims were subsumed by the class allegations in *Burnell.*[1] JN-123–128. This reason no longer applied, however, after May 2016 when the district court denied certification in *Burnell.* 3-ER-310–327. (That is why the plaintiffs' lawyers in cases

---

[1] It was also stayed because of FAAAA preemption cases then pending before this court. This preemption issue was resolved in 2014, however, by *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 650 (9th Cir. 2014) (FAAAA does not preempt drivers' meal and rest period claims).

3

such as *Mares* moved to have the stays in their cases lifted. JN-242–243 (*Mares* stay imposed); JN-245–246 (*Mares* stay lifted – "As the Court denied class certification in <u>Burnell</u>, the justification for the stay no longer exists."). Nevertheless, Rudsell's counsel remained content to let their case lie dormant for almost two more years until, out of the blue, Swift's counsel came calling.

Burnell's counsel, by way of contrast, devoted over 2,500 hours to the prosecution of their case. Swift Brf. at 21. But this vigorous prosecution abruptly ended when they lost their certification motion. Between May 25, 2016, when they completed work on a F.R.C.P. 23(f) petition, and April 10, 2018, when they began work on the mediation in this case, there are but two entries in counsel's time records—an average of about one entry per year. 2-ER-196.

In short, Rudsell's counsel lost all interest in prosecuting their case after it was stayed in 2013. Burnell's counsel lost all interest in prosecuting their case after certification was denied in 2016. These counsels' interest in prosecuting their cases only perked up when Swift came calling, offering money for moribund cases, in 2018.

So why, in 2018, did Swift choose to negotiate with two firms that had, for all practical purposes, abandoned the prosecution of their cases? Mares submits that a district court that was truly on the lookout for subtle signs of a reverse auction should have asked.

**II. The District Court Didn't Ask Why the Settlement Agreement Contained Terms That Were Unjustifiably Favorable to Swift.**

Moreover, the district court should have made a serious inquiry into terms of the settlement that seem unjustifiably favorable to Swift, specifically the release of numerous newly-added, but unlitigated, PAGA claims (Section A), and the inclusion of a clear sailing agreement (Section B).

**A. The Settlement Agreement Released Newly-Added, Unlitigated PAGA Claims.**

After concluding the settlement, the settling parties filed an Amended Consolidated Complaint adding numerous Labor Code violations to the list of PAGA claims to be released. *Cf.* 2-ER-279:23-26 *with* 3-ER-347:2-3 *and* JN-170:4-6. These newly-added claims were never investigated by plaintiffs' counsel. 2-ER-145–164 (*Rudsell* time records); 2-ER-195–106 (*Burnell* time records). The district court never asked why these unlitigated claims were added to the case post-settlement. Mares contends that a district court that was dutifully protecting the interests of the absent would have inquired.

Swift responds that the language of the settlement release is limited and does not, despite appearances, actually serve to release claims for what it calls a "boilerplate" list of Labor Code violations. Swift Brf. at 26-28. But, contrary to Swift's representation, the language in the release is not so limited; indeed, the language releases these claims explicitly. JN-65:10-13 ("The Class Released Claims

also include any and all claims under the Private Attorneys General Act, Cal. Lab. Code § 2698 et. seq. ('PAGA') that were or could have been asserted based on the facts alleged or are reasonably related to those asserted.").  To remove any doubt, the release also provides:  "The Class Released Claims include any and all claims arising under the California Labor Code to the extent the following code sections relate to or include the Released Claims set forth above (including, but not limited to, sections 200, 201, 201.3, 201.5, 202, 203, 204, 205.5, 210, 212, 216, 218, 218.5, 218.6, 222, 222, 222.5, 223, 224, 225, 225.5, 226, 226.7, 226.8, 227.3, 450, 510, 511, 512, 516, 558, 1174, 1174.5, 1194, 1194.2, 1197, 1196.1, 1197.2, 1198, 1198 [sic], 2698 et seq. and 2699 et seq.) . . . ."  JN-64:24–65:2.

Swift next contends that the claims arising from these added statutory violations are identical to claims made previously.  Swift Brf. at 26-27 ("Mares identifies several *statutes* cited in the Consolidated complaint's PAGA claim for relief that were not expressly identified in the prior complaints, but the underlying *claims* are identical.").  But a sampling of these statutes puts the lie to that contention.  Look, for example, at Labor Code Section 201.3.  This provision provides for weekly or even daily payment of wages to employees of temporary services employers.  There is nothing in the prior complaints remotely encompassing this liability.  3-ER-413–433 (*Burnell* Complaint); JN-153–175 (*Rudsell* First Amended Complaint).  Look at Labor Code Section 201.5.  This provision regulates

the timing and manner of final payment for employees engaged in the production of motion pictures. Again, there is nothing even remotely relevant in prior complaints. *Id.* Look at Labor Code Section 205.5 specifying the timing of wages to agricultural employees. The same. *Id.* And on and on and on.

Taking a different tack, Swift asks this court to simply ignore this issue, for two reasons. First, Swift argues that Mares presented this issue to the district court too late. Swift Brf. at 25-26. But the district court did consider Mares's argument and implicitly rejected it. 1-ER-7:12-18. As a result, this Court should consider it. *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 948n.7 (9th Cir. 2015) ("Since the district court did rule on it, however, we consider it on appeal."); *United States ex rel. Green v. Northrop Corp.,* 59 F.3d 953, 957n.2 (9th Cir. 1995) (waiver rule a matter of discretion).

Second, Swift argues that Mares lacks standing to appeal PAGA claims. Swift Brf. at 26. But the release prohibits individual employees, such as Mares, from bringing their own *individual* PAGA claims. The Supreme Court's recent *Viking River* decision overturned California law that prohibited the individual enforcement of PAGA claims. *Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906, 1924-1925 (2022).[2] A necessary implication of that decision is that individual employees are

---

[2] *Viking River* postdated this court's first decision in the case at bar and thus invalidates this court's holding that "a PAGA action has 'no individual component.'" *Saucillo v. Peck,* 25 F.4th 1118, 1128 (9th Cir. 2022).

7

*principals* in their own, individual, PAGA claims. *Lewis v. Simplified Labor Staffing Solutions, Inc.* (2022) 85 Cal.App.5th 983, 997. Therefore, Mares has standing because the release forecloses *him* from bringing *his own* individual PAGA claim.

In sum, Mares submits that a district court that was rigorously protecting the interests of absent class members would have investigated why the plaintiffs' counsel amended their lawsuit post-settlement to add unlitigated claims and why they released those claims *en masse*.

## B. The Settlement Agreement Contained a Clear Sailing Provision.

There are two flavors of clear sailing provisions: Those protecting an attorney's fee to be paid from the class settlement fund, and those protecting an attorney's fee to be paid separately by the defendant. The district court held that the first flavor, applicable here, does not serve to signal collusion, and so it never asked why the clear sailing provision was included in the settlement agreement. ER-7:4–8:1. But the district court's holding conflicts with *Allen v. Bedola,* 787 F.3d 1218, 1224 (9th Cir 2015), which explicitly held that a clear sailing agreement of the first flavor was a subtle sign that plaintiffs' counsel had allowed self-interest to infect negotiations.

Swift argues that the controlling authority is not *Allen,* but rather the earlier case of *Rodriguez v. West Publ. Corp.*, 563 F.3d 948 (9th Cir. 2009). Swift Brf. at 22-24. And it is true that in *Rodriguez* this court denied that a clear sailing agreement

8

of the first flavor signaled "the possibility of collusion." *Rodriguez*, 563 F.3d 948, 961n.5. But *Rodriguez*, unlike *Allen*, and unlike the case at bar, involved a *post*-certification settlement, with its concomitant reduced level of judicial scrutiny. *Rodriguez*, 563 F.3d 948, 956-957.

When evaluating *pre*-certification settlements, however, district courts must look not only for signs of collusion, but also for signs that plaintiffs' counsel's self-interest played a part in negotiations. In *re Bluetooth*, 654 F.3d 935, 947 (In evaluating pre-certification settlements, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."). As a result, when reviewing pre-certification settlements, district courts must undertake "a higher level of scrutiny for evidence of collusion or other conflicts of interest." *Allen v. Bedola,* 787 F.3d 1218, 1221, 1224.

The *Allen* case, like the case at bar, involved a *pre*-certification settlement. *Allen v. Bedola,* 787 F.3d 1218, 1221, 1224. And the *Allen* court explicitly identified a clear sailing provision of the first flavor as one of the subtle signs of self-interest that district courts must look for. *Id.* at 1224 ("Labor Ready agreed not to dispute the award of fees to class counsel, as long as that award did not exceed 25% of the

common fund," which is a "subtle sign" that "class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations.").[3]

The plaintiffs' counsel's self-interest, of course, is in obtaining and maximizing the attorney's fee. The clear sailing agreement serves only to benefit the plaintiff's counsel. It does not benefit the defendant. It does not benefit the class. It does not benefit the court, which is denied the advantages of an adversarial examination of the attorney's fee. *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991).[4] Mares submits that a district court looking closely for signs that plaintiffs' counsel's self-interest might have played a part in the decision to settle should have asked what the defendant received in exchange for providing this benefit to plaintiffs' counsel. *Id.* (unlikely that defendant would agree to a clear sailing provision without a quid pro quo).

---

[3] Swift also suggests, without benefit of supporting authority, that a clear sailing provision is only a sign of a conflict of interest when it is paired with a reverter provision. Swift Brf. at 22-24. But several Ninth Circuit cases have identified the clear sailing provision and the reverter provisions as separate "subtle signs." *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019), citing *Allen v. Bedola,* 787 F.3d 1218, 1224, quoting *In re Bluetooth*, 654 F.3d 935, 947 (9th Cir. 2011).

[4] In Objector's Opening Brief, at 16, Mares cited *Weinberger* (calling it "*Weinberg"*) as a Ninth Circuit case. He would like to correct the record. It is a First Circuit case.

### III. The District Court Didn't Ask Why the Exposure Estimate Made No Sense.

Mares argues that the settling parties failed to produce evidence sufficient to support a finding of adequate relief to the class. Mares Brf. at 19-23. Swift contends that Mares's argument is based on "deeply confused and misleading calculations," "faulty assumptions," and "fuzzy math." Swift Brf. at 31-34. Is Swift correct?

To begin, the settling parties estimated the exposure at $211 million. JN-25–29; 2-ER-251.[5] The district court accepted their estimate. 1-ER-16:18-19. The largest component of this $211 million exposure estimate is $96 million for "unpaid wage claims." JN-25. This $96 million estimate is the product of several factors, including "an estimated 2500 drivers per day incurring that allegedly unpaid time." *Id.* Swift, however, rejects plaintiffs' counsel's estimate of 2,500 drivers per day; Swift says that the true number is some unknown number between 1,600 and 2,500 drivers per day.[6] Swift Brf. at 32.

---

[5] Mares pointed out that this estimate is but a partial estimate—it includes only four of the numerous claims alleged. Mares AOB at 20n.4. The settling parties do not, and cannot, dispute this point.

[6] Swift suggests two reasons why plaintiffs' counsel overstated the average number of drivers who incurred unpaid wage claims. The first is that they failed to account for vacations and other time off (Swift Brf. at 33); the second is that this number includes not only mileage-based drivers, who are included within the class, but also hourly drivers, who are not (Swift Brf. at 33-34). For the first reason, Swift presents absolutely no evidence to support its assertion. The second reason will be addressed in the following section.

For the sake of argument, let us assume that Swift is correct, and let us perform the same calculations that we performed in the Objector's Opening Brief at 21-23, but instead of 2,015 average number of drivers, let us use Swift's *bare-minimum* number—1600. Otherwise, let us use the two factors (669 Workweeks in the Class Period and 847,503 Total Workweeks Worked by Drivers in Class Period) that were used before.

1,600 Drivers x 669 Workweeks in Class Period = 847,503 Total Workweeks Worked by Drivers in Class Period.

Again, there is a problem, because $1,600 \times 669 \neq 847,503$.

Instead, $1,600 \times 669 = 1,070,400$.

Where is the error? In this formula, the number of calendar workweeks in the class period (669) must be correct because it is simply the count of the number of calendar weeks included within the class period (Mar 22, 2006, to January 31, 2019). Therefore, either the 1,600 average number of drivers or the 847,503 total workweeks worked must be "plainly wrong."

But let us continue down this rabbit hole. If, despite the constraints of physical and temporal reality, Swift is correct that an average of at least 1,600 drivers somehow worked a mere 847,503 workweeks during a calendar period spanning 669 weeks, then it follows (1) that the plaintiffs' lawyers made a false representation when they told the court that there was "an estimated 2500 drivers per day incurring

12

that allegedly unpaid time"; (2) that the true "estimated number of drivers incurring allegedly unpaid time" is fewer than 2,500 drivers per day, more than 1,600 drivers per day, but otherwise unknown; and (3) that the exposure estimate for "unpaid wage claims" is less than $96 million, more than $61.44 million,[7] but otherwise unknown.[8]

But if Swift knew that the $96 million estimate for unpaid wages was wrong, then why did *Swift itself* tell the district court that the exposure for unpaid wages was $96 million? 2-ER-251 ("the maximum exposure amount" includes "$96,000,000 for unpaid wages.") And who, exactly, is "deeply confused"?

Finally, Swift claims not to understand the significance of plaintiffs' counsels' false representations about the factors underlying their exposure analysis. Swift Brf. at 34. Since this settlement was concluded pre-certification, the district court was required to look closely and skeptically at the plaintiffs' counsel's submissions to determine whether their interest in a windfall fee might have influenced their decision to settle. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043. These

---

[7] $96 million x (1600 drivers/2500 drivers) = $61.44 million.

[8] Moreover, if the $96 million estimate for unpaid wage claims is wrong, then presumably the twin $48 million estimates for meal period and rest periods violations are wrong as well, since these estimates are calculated simply by cutting the unpaid wage claim estimate in half. JN-25–26. Mares pointed out that estimating the exposure for the two break claims by halving the exposure for the unpaid wage claims was nonsensical and arbitrary. Mares Brf. at 20. The settling parties do not, and cannot, dispute that point.

submissions demonstrate that plaintiffs' counsel had insufficient knowledge of, or care about, the class claims to discharge their fiduciary duty to adequately represent the class's interests. F.R.C.P. 23(e)(2)(A). Moreover, the enormous holes in their evidentiary submissions demonstrate that the evidence cannot support *any* reasonable estimate of the class exposure, and thus the district court's finding that the relief was adequate cannot be sustained. F.R.C.P. 23(e)((2)(C).

## IV. The District Court Didn't Ask Why There Were Only 19,544 Class Members.

Swift represented to the district court that the number of class members is 19,544. 2-ER-204:25-205:2. But in their motion for preliminary approval of the settlement, the settling parties cited to and relied on a declaration from Robin Rowher, Swift's Director of Payroll, stating that "from September 24, 2013 through present date [August 18, 2017], Swift employed 20,900 drivers assigned to terminals in California." ER-252:7-9; JN-223:23-25. The settling parties never explained to the district court how the class size could shrink while the class period expanded. 2-ER-134:17-137:23.

Swift now seeks to make this explanation to this court. Swift Brf. at 33-35. According to Swift, "the Settlement in this case is limited to employee drivers who earned mileage-based compensation, while the removal declarations [*e.g.,* Rowher's

14

declaration above] provided data for all of Swift's employee drivers." *Id.* at 33-34.[9] Thus, Swift explains the discrepancy by contending that the 19,544 number is a count of the number of *mileage-based* drivers, while the 20,900 number is a count of both *mileage-based* and *hourly* drivers.

This is a dispute, of course, that should have been resolved by the district court. If the district court had looked skeptically at the settling parties' submissions, it would have required the settling parties to provide this explanation before it ever approved the settlement.

And if the district court had required the settling parties to provide this explanation, it would have rejected the explanation then and there. Rohwer's declaration stating that there were 20,900 drivers assigned to terminals in California from September 2013 to August 2017 was filed in support of Swift's Notice of Removal of a Superior Court case, *Peck v. Swift Transportation,* Riverside Superior Court Case No. 1411184, to the Central District, Case No. 2:17-cv-06713. JN-220. In the underlying Complaint, Lawrence Peck brings a PAGA action on behalf of the following aggrieved employees:

---

[9] Swift further represents that "Swift employs many drivers who are paid hourly, rather than under a mileage-based system," but does not support that representation with any citation to the record. *Id.* at 34.

> "All persons presently and formerly employed by Defendants Swift and Does 1-30 in California as non-exempt hourly truck drivers who performed any services in California during the covered period and **was paid on a per mile basis**." JN-229:17-20 (emphasis added).

Thus, when Rowher submitted his declaration, he was stating that there were 20,900 drivers *paid on a per mile basis* assigned to California terminals between September 2013 and August 2017. Otherwise, his statement would not have been relevant to the removal petition.

Moreover, *Swift itself* represented to the district court that Rohwer was talking about "class member drivers"—that is, drivers paid on a mileage basis. In the settling parties' supplemental brief in support of preliminary approval, they stated: "Later, the average number of class member drivers employed by Defendant increased to approximately 2,500." 2-ER-28:7-9. In support of this representation, they cited to paragraph 10 of Rohwer's declaration: "*Peck v. Swift Transportation Co. of Arizona,* 2:17-cv-06173, Dkt. 3, ¶ 10." 2-ER-28:7-9. Here (again) is "Dkt 3, ¶ 10" of Rohwer's declaration in its entirety:

> "10. Based on a compilation of corporate data which I obtained and reviewed here in Phoenix, Arizona, from September 24, 2013 through present date, Swift employed over 20,900 drivers assigned to terminals in California. On average Swift employed approximately 2,500 active drivers on any given day who were assigned to terminals in California." JN-223:23-27.

Thus, Swift was representing that the 2,500 "active drivers on any given day" were "class members." In context, it follows that the "20,900 drivers" were also

16

"class members." And, as Swift points out, only "mileage-based" drivers are "class members." Swift Brf. at 33.

In sum, the district court never investigated this conflict in the numbers that the settling parties submitted. It never considered the implication that the plaintiffs' counsel seemed uninterested in taking even the most rudimentary steps—*e.g.,* simply using a calculator—to determine whether the numbers presented by Swift made any sense at all. It never considered whether the plaintiffs' counsel's lack of interest might have stemmed from their desire to ensure their receipt of a windfall fee from cases they had already written off. Mares submits that the district court failed to protect the absent class members.

## Conclusion.

Mares asks for reversal of the judgment with instructions to deny approval of the settlement.

Respectfully submitted,

Date: January 9, 2023

Aiman-Smith & Marcy

*/s/ Joseph Clapp*

_____

Joseph Clapp, Esq.
Attorneys for Objector and
Appellant Sadashiv Mares

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 22-55560

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

| | |
|---|---|
| Shaun Setareh, Esq. | Neal J. Fialkow, Esq. |
| Setareh Law Group | James S. Cahill, Esq. |
| 315 South Beverly Dr., Ste. 315 | Law Office of Neal J. Fialkow, Inc. |
| Beverly Hills, CA 90212 | 215 N. Marengo Ave., 3rd Fl. |
| Attorneys for James R. Rudsell | Pasadena, CA 91101 |

**Description of Document(s)** *(required for all documents)*:

Objector-Appellant's Reply Brief

**Signature** | s/ Alissa Cerro | **Date** | Jan. 9, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 15** *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-55560

I am the attorney or self-represented party.

**This brief contains** 3,993 **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

 [ ] it is a joint brief submitted by separately represented parties.
 [ ] a party or parties are filing a single brief in response to multiple briefs.
 [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Joseph Clapp, Esq. **Date** Jan. 9, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*